## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| KEITH LAWSON, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | )    CASE NO.: 03:06-CV-641-WKW |
| | ) |
| CITY OF ALEXANDER CITY, | ) |
| MAYOR BARBARA H. YOUNG AND | ) |
| DANNY PEPPERS in their individual | ) |
| capacities, | ) |
| | ) |
| DEFENDANTS. | |

### MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON BEHALF OF DEFENDANTS

COME NOW the Defendants City of Alexander City , Mayor Barbara H. Young and Danny Peppers (hereinafter known as "Defendants") in the above-styled cause and submits the following memorandum brief and evidentiary materials in support of their motion for summary judgment.

### I.
### *Summary of Plaintiff's Allegations and the Defendants' Affirmative Defenses*

Plaintiff Keith Lawson ("Lawson"), a black male, alleges that Defendants terminated him because of his race. Lawson brings the race claim pursuant to Title VII, §1981 and §1983.

This lawsuit was filed on July 19, 2006. The Defendants filed an answer on August 22, 2006. Defendants now seek summary judgment based on the premise that Lawson was terminated for a legitimate, non-discriminatory reason and that there is no evidence of pretext such that a question of fact exists as to a race discrimination claim.

*II.*
## *Summary of Undisputed Facts*[1]

**A.     The Parties**

**1.     Keith Lawson**

Keith Lawson is a 36 year old black male who resided in Alexander City during the relevant time period.  (See Exhibit "A" Deposition of Keith Lawson p. 7 at lines 2-6, p. 9 at line 19 to p. 10 at line 4).  Lawson worked for Alexander City from approximately June 2004 to December 8, 2005.  (Lawson Depo. p. 59 at line 3-5; See Exhibit "B" Affidavit of Mayor Barbara Young at ¶ 11).  Lawson worked as a meter reader for the City from August 10, 2005 to December 8, 2005.  (Young Aff. at ¶¶9,11).

Because of an issue regarding disclosure of information on his application for employment, Lawson's criminal record is relevant and described by him as follows:

Lawson was convicted in Georgia for possession with intent to distribute cocaine.  (Lawson Depo. p. 68 at lines 6-14).  He served a year in prison.  (Lawson Depo. p. 68 at lines 20-22).  Lawson was also charged in Georgia for theft by taking and placed on probation which lasted until he was sentenced to prison on the other charge.  (Lawson Depo. p. 70 at line 19 to p. 71 at line 8). Lawson also had a drug conviction in Alabama in 1991 for cocaine use.  (Lawson Depo. p. 72 at lines 7-22).  He served three years probation.  (Lawson Depo. p. 73 at lines 2-8).  Lawson  was convicted of a charge regarding a forged document in Alabama in 1995.  (Lawson Depo. p. 74 at lines 8-15).  He served eighteen months in an Alabama state penitentiary.  (Lawson Depo. p. 74 at line 23 to p. 75 at line 4).  Lawson was found guilty of a drug possession charge in Alabama in 2002 and served a year in a rehabilitation facility in Mobile, Alabama.  (Lawson Depo. p. 76 at lines

---

[1]  For purposes of clarity this statement of material and undisputed facts includes factual allegations of Lawson, which may not be relevant or actual facts.  Rather, this is a statement of "facts" for purposes of summary judgment.  See *Cox v. Administrator, U.S. Steel and Carnagie Pension Fund*, 17 F.3d. 1386,1400 (11th Cir. 1994).  This statement may also contain statements of the absence of critical needed facts, for purposes of clarifying the issues.

5-14). When asked if there were other convictions in Alabama that he had not yet described, Lawson said that he had been arrested several times for speeding, eluding the police, driving while his license was revoked, theft, burglary, domestic violence, public intoxication, and disorderly conduct. (Lawson Depo. p. 77 at lines 3-23). He has served time in the Alex City jail for this conduct. (Id.) He explained that his domestic violence charges were brought by different women. (Lawson Depo. p. 79 at line 8 to p. 80 at line 8).

Lawson was arrested in December 2006 in Louisiana. (Lawson Depo. p. 84 at lines 11-16). He was arrested for possession of intent to distribute marijuana. (Lawson Depo. p. 84 at line 21 to p. 85 at line 1). The matter is still pending.

### 2.    The City of Alexander City, Mayor Young and Danny Peppers

The City of Alexander City ("the City" or "Alex City") is a municipal entity located in Tallapoosa County, Alabama. Defendant Barbara Young has been the Mayor of Alex City since October 2004. (Young Aff. at ¶2). The Mayor prior to Ms. Young was Don McClellan. (Young Aff. at ¶2). Defendant Danny Peppers has worked for Alex City for thirty-two years. (See Exhibit "C" Affidavit of Danny Peppers at ¶2). Mr. Peppers has worked in the Meter Reading Department for almost thirty years and serves as a department head. (Peppers Aff. at ¶2). As part of his job responsibilities, Mr. Peppers supervises all of the meter readers. (Peppers Aff. at ¶3). Jason Locke is the Revenue Officer for Alex City. (See Exhibit "D" Affidavit of Jason Locke at ¶2). As part of his job responsibilities, Mr. Locke rectifies any billing issues regarding utility usage in Alex City which can occur from incorrect or estimated meter readings. (Locke Aff. at ¶2). Eugene Mahan is the Superintendent of Water Treatment for Alex City. (See Exhibit "E" Affidavit of Eugene Mahan at ¶2). Mr. Mahan has worked for the Alex City for twenty-eight years. (Mahan Aff. at ¶2).

B.    **Lawson's Employment History With The City**

1.    **The Lee Staffing Application**

Lawson executed an application for employment with the employment agency, Lee Staffing, Inc. on March 29, 2004. (Lawson Depo. p. 52 at lines 11-14; Exhibit "F" Copy of 2004 Lee Staffing Application). When Lawson first went to Lee Staffing looking for a job with the City, he was told he could not have a job with the City because he did not have a valid driver's license. (Lawson Depo. p. 87 at line 5 to p. 88 at line 22). Lawson claims that when asked, on the application, if he had been convicted of a felony, he did not check anything. (Lawson Depo. p. 92 at line 21 to p. 93 at line 1). He says he left it blank. (Lawson Depo. p. 92 at line 21 to p. 93 at line 10). The application on record indicated "No" as answer to the felony conviction question. (See Application).

Lawson said that when he was terminated from the City (discussed more fully below), he was told that he would never have been hired if they had known he had been convicted of a felony. (Lawson Depo. p. 95 at lines 13-16). Thereafter, Lawson went back to Lee Staffing and got a copy of his application wherein he claims the question regarding felony conviction was still blank at that time. (Lawson Depo. p. 95 at lines 6-18, p. 97 at lines 6-22).[2] This is the only application ever filled out by Lawson with Lee Staffing. (Lawson Depo. p. 87 at line 21 to p. 90 at line 20).

2.    **The Water Filter Plant**

Lawson claims he did not find a job through Lee Staffing, but he spoke to then Mayor McClellan who hired him at the treatment plant sometime in June 2004. (Lawson Depo. p. 56 at

---

[2] During his deposition, Lawson marked various aspects of the Lee Staffing application wherein he alleges that he did not write the information as indicated. He explains the differences in his deposition. (Lawson Depo. p. 97 at line 19 to p. 99 at line 23).

line 14 to p. 59 at line 5).[3]  Lawson worked at the treatment plant as of June 2004 but did so through Lee Staffing, not as a City employee.  (Lawson Depo. p. 58 at lines 13 to 18).

Lawson claims that Mayor McClellan knew of his prior felony convictions and arrest record, but was trying to give him a chance.  (Lawson Depo. p. 57 at lines 6-21).  The supervisor, Mr. Mahan, was the only person Lawson interviewed with before he took the job at the treatment plant. (Lawson Depo. p. 110 at lines 6-9).  Lawson worked at the treatment plant through Lee Staffing as a temporary filter operator until he was hired by the City on December 20, 2004 in a full-time permanent position.  (Lawson Depo. p. 58 at lines 11-18, p. 109 at lines 15-22).  Lawson claims that when he was working with Mr. Mahan (presumably while employed with Lee Staffing), they became very close and that Mr. Mahan explained to him it would be very difficult to get a job with the City because of Lawson's drug arrests and his trouble with the police.  (Lawson Depo. p. 115 at lines 1-13).

On December 20th a slot came open for a full-time position with the plant and Lawson talked with the new Mayor, Barbara Young.  (Lawson Depo. p. 110 at line 2 to p. 111 at line 5).  Lawson obtained his driver's license before he talked to Mayor Young about the job.  (Lawson Depo. p. 111 at lines 17-23).  Lawson claims he told Mayor Young about his previous felony conviction during this conversation.  (Lawson Depo. p. 114 at lines 10-19).  Lawson claims that when he told the Mayor about his past, she said, "everybody makes mistakes and everybody ought to have a second chance and she said she would be willing to work with me and give me an opportunity."  (Lawson Depo. p. 115 at lines 17-20).  Lawson says he explained to the Mayor that he had changed his life. (Lawson Depo. p. 115 at lines 21-23).  Mayor Young unequivocally denies any knowledge of

---

[3] After speaking with Mayor McClellan, Lawson says he later got a phone call from the Mayor telling him to go to Lee Staffing where he received an interview slip for the City.  (Lawson Depo. p. 107 at line 18 to p. 108 at line 13).

Lawson's prior felony convictions and insists that he would not have been hired by the City if she had had such knowledge.  (Young Aff. at ¶ 13).

Lawson was ultimately hired in a full-time position as a water filter operator trainee Grade 4 with the City.  (Lawson Depo. p. 116 at lines 19-21).  When he was hired by the City he was given a stipulation that he had to obtain a Grade 4 certification within a fifteen month period.  (Id.) Lawson claims he took the class to prepare for the Grade 4 test and then took the exam.  (Lawson Depo. p. 117 at lines 2-11).  The City provided Lawson an opportunity to study for the Certified Operator Test.  (Lawson Depo. p. 132 at lines 14-17).  The City paid to send Lawson to school to study for the exam.  (Lawson Depo. p. 132 at line 18 to p. 133 at line 15). However, Lawson failed the exam.  (Lawson Depo. p. 117 at lines 2-11).  When Lawson's six month probationary period was scheduled to end, his supervisor, Mr. Mahan, wanted his six month probationary period extended because of his lack of effort regarding obtaining the certification.  (Young Aff. at ¶6). However, Mayor Young refused Mr. Mahan's request and granted Lawson full employment status with a raise at the end of his six month probationary period.  (Id.)  Mr. Mahan explained that Lawson told him that he was going to class to prepare for the certification exam.  (Mahan Aff. at ¶7).  However, Mr. Mahan found out Lawson had, in fact, not gone to most of the classes and at some point quit going altogether.  (Id.)  Mr. Mahan talked to Lawson about it and Lawson asked Mr. Mahan if Lawson should quit.  (Id.)  Mr. Mahan said that Lawson had issues with the swing shift and had simply stopped all efforts to obtain certification.  (Id.)  Mr. Mahan encouraged Lawson to transfer to a job that better suited Lawson's schedule.  (Id.)  Lawson claims that the City was going to extend his probation so that he could receive the Grade 4 certification but instead ended his probation and transferred him to a job as a meter reader.  (Lawson Depo. p. 119 at line 12 to p. 120 at line 13).  He concedes receiving the six months raise.  (Lawson Depo. p. 120 at lines 11-13).

### 3.    Meter Reader Department

After ending his probationary period and receiving the raise in August 2005, Lawson transferred to the meter reader department after interviewing with Danny Peppers. (Lawson Depo. p. 138 at line 20 to p. 139 at line 18). Mr. Mahan recommended Lawson for the meter reader position. (Mahan Aff. at ¶8; Peppers Aff. at ¶3). Danny Peppers, the supervisor of the meter readers, confirms that he talked to Lawson when Lawson applied for the transfer. Peppers said he and the Mayor discussed the need for Lawson to move into another position and decided to give him a try. (Peppers Aff. at ¶3). Mayor Young explained she was making every effort to help Lawson keep a job with the City, therefore she talked to Peppers about giving Lawson a chance in the Meter Reading Department. (Young Aff. at ¶8). Peppers had no knowledge whatsoever of Lawson's prior felony convictions. (Peppers Aff. at ¶3).

On Lawson's first day as a meter reader, Peppers assigned him to train under Chad Walker. (Lawson Depo. p. 142 at lines 2-8; Peppers Aff. at ¶4). Lawson described his training as Walker showing him how to use the computer printouts to keep a record of the meters that were read on gas, electricity and water. (Lawson Depo. p. 142 at lines 14-17). Lawson said the main part of the training was learning how to locate the water meter. (Lawson Depo. p. 143 at lines 2-8). Every meter reader had a specific area where they were programmed to go. (Lawson Depo. p. 143 at lines 11-13). Lawson became a meter reader for the route where he was trained by Walker. (Lawson Depo. p. 144 at line 4 to 11). Lawson states unequivocally that he was taught to not estimate meters. (Lawson Depo. p. 146 at lines 10-14). After working for ninety days with Walker, Lawson felt qualified and trained to go on his own. (Lawson Depo. p. 146 at line 18 to p. 147 at line 4). In fact, Lawson said he was pulled off of the ninety-day probation a little early because Peppers felt like he could go on his own. (Lawson Depo. p. 147 at lines 8-10). According to

Lawson, he was handling the route by himself by the end of October 2005. (Lawson Depo. p. 147 at lines 11-13).

Monday through Friday, Lawson would report to work, pick up from where he left off on his route the day before and continue to read meters. (Lawson Depo. p. 148 at line 7 to p. 149 at line 2).

Lawson began to train Christy Williams regarding his route in early December 2005. (Lawson Depo. p. 149 at lines 14-18). Lawson stayed in charge of the hand-held computer where the readings were entered while training Williams. (Lawson Depo. p. 155 at lines 17-21; p. 156 at lines 14-16). At one point Lawson said that Williams knew what she was doing and they worked pretty fast together. (Lawson Depo. p. 157 at lines 8-20). Lawson also said that during the time that he and Williams rode together, she never made complaints to him about how he read meters, but quickly Lawson changed his attitude toward Williams and described her as a lazy person who did not really get out of the truck that much. (Lawson Depo. p. 158 at line 13 to p. 159 at line 6).[4]

Several days into training Williams, on December 8, 2005, Lawson was terminated for estimating meters instead of reading them. (Lawson Depo. p. 149 at lines 14-18; Peppers Aff. at ¶8; Young Aff. at ¶¶ 10 and 11).

C.    The Termination

Lawson said that after three or four days of riding with Williams, they were in the Lincoln Heights neighborhood in Alex City when Peppers radioed them to come in for a meeting. (Lawson Depo. p. 157 at line 21 to p. 158 at line 3). Lawson said that, even though he did not know at the time, he now knows that Williams accused him of estimating meters. (Lawson Depo. p. 161 at line

---

[4]  To the extent it becomes relevant later, it should be pointed out that another meter reader, Dax Thomas, also allegedly rode with Lawson during this time. At all times Lawson was in charge of the hand-held computer for the entries of the meter readings. (Lawson Depo. p. 159 at line 10 to p. 160 at line 6).

20 to p. 162 at line 8). He does not know why she reported that he was estimating. (Lawson Depo. p. 162 at line 21 to p. 163 at line 2).

On or about December 8, 2005, Peppers was informed that Lawson was estimating meters instead of actually reading them. (Peppers Aff. at. ¶5). Based on this information, Peppers examined computer printouts looking specifically for times of meter reading entries. (Peppers Aff. at ¶6). He found that there was no way that Lawson was actually reading the meters in the time frame that was being entered into the computer. (Peppers Aff. at ¶6). As example, Peppers noted the fact that Lawson was registering water meters in the computer that were scattered out in a neighborhood as if he had read ten to fifteen meters in one minute. (Peppers Aff. at ¶6). Peppers testified that it was impossible for Lawson to have made a physical reading of the meters and entered those readings in the time frame indicated. (Id.) Peppers further provided that in addition he had evidence that Lawson did not actually read the meters because some of the houses did not fall in line in regards to how their account numbers were in the computer. (Peppers Aff. at ¶6). However, Lawson had entered the information as if the houses were physically located beside one another and as if he had walked to each one of them, one beside the other. (Peppers Aff. at ¶6). Peppers explained that such was impossible given their actual locations on the route. (Peppers Aff. at ¶6). Peppers took the investigation further and personally examined some of the meters on Lawson's route (Id.) Several of the water meter lids that were on the route that were supposedly read in the last forty-eight hours or so were covered with debris, not appearing in the manner expected had the meters been read recently. (Id.) Lastly, Peppers found that several of the meters checked had readings entered in the computer that were higher than what the meter was reading with Peppers checked it. (Id.) Based on this information, Peppers took the information to the Mayor and recommended the termination of Lawson. (Peppers Aff. at ¶7). The Mayor agreed and

had a meeting with Lawson and Peppers wherein she informed Lawson he was terminated.

(Peppers Aff. at ¶¶7-8; Young Aff. at ¶¶10-11).

Lawson describes the day of his termination as follows:

A.    The day I was fired, December 8th, they didn't present me with any information on anything I requested.  They said they had a witness, he said he had proof, and they would never bring anything up.  They said they didn't have to answer me.  That's what was said.  I was fired, my service was no longer needed at the City.  And the supervisor kept saying that he got proof, and I was sitting there asking what kind of proof you can bring, you know, to the table, and he was like he didn't have to.  And I even asked the Mayor do you think it is feasible to bring the witness in here if you are accusing me of taking these actions, and she said they don't have to prove anything - - it was because I was on probation.

(Lawson Depo. p. 164 at lines 7-22).

When asked what he said when told that he was being terminated for estimating meters,

Lawson testified as follows:

A.    I told him how can he prove that?  I said, you ain't seen me estimating meters.  He said - - he kept sucking on his teeth - - he do some kind of way - - telling me, I know, I know, I know.  And I said, well if you know let's go see the Mayor - - and we came on up.  I said I didn't want to talk about it anymore.

Q.    So he never told you how he knew.

A.    No sir, he did not.

Q.    And when you got to the Mayor, was it the three of you in there?

A.    Yes, sir.

Q.    What happened in the Mayor's office?

A.    I sit down on the chair and she had her back turned and she was talking to me and she never did turn around.  And she was saying well, Danny has informed me that you have been estimating meters and you are terminated, your service is no longer.  I said just like that?  And she said, yeah, just like that.  I said you are not going to reprimand me or I've never been wrote up, or anything like that, you are just going to fire me?  And she said, well, Danny been working for the City for 30 years and he know what he's doing.  So I said,

10

> well, I don't feel like I'm treated right. And she said - - and I said if I'm the only meter reader that is reprimanded today or terminated, that I was going to get me a lawyer and I was going to sue them. And she turned around and told me, sue me on what grounds? And I said racial discrimination - - because I was the only meter reader brought to the office that day, and the only one reprimanded, and the only one fired. ...

(Lawson Depo. p. 172 at line 10 to p. 173 at line 23).

Lawson denies that he ever estimated reading meters. (Lawson Depo. p. 160 at lines 22-23, p. 161 at lines 9-10). Lawson says that there has never been a complaint about him reading meters incorrectly. (Lawson Depo. p. 170 at lines 18-22).

**D.      After the Termination**

The issues discussed by Lawson occurring after his termination are as follows:

**1.      Grievance Procedure Letter**

Lawson testified that at the time of his termination he asked for a grievance form and he was denied that form based on the assumption that he was a probationary employee. (Lawson Depo. p. 179 at line 5 to p. 180 at line 15). However, Lawson was called back to the Mayor's office the next day so that she could give him a letter and in that meeting she told him that she had made a mistake, that he did have a right to file a grievance form. (Id.) She also told him that she would reconsider her decision as part of the grievance process. (Id.) Lawson refused to take the letter from the Mayor. (Id.,Lawson Depo. p. 180 at lines 17 to p. 181 at line 3).

Lawson provides convoluted information regarding Mayor Young making a mistake, seemingly in an attempt to insinuate that Mayor Young said she made a mistake regarding the termination. However, when questioned further, Lawson said: "I don't know what she means - - she made a mistake, that's what she said." (Lawson Depo. p. 186 at lines 10-18). Mayor Young clarifies that she in fact told Lawson she made a mistake about whether he had a right to file a

11

grievance and attempted to give him a letter explaining his rights. (Young Aff. at ¶11)[5]. Critically, Lawson refused to take the letter. (Lawson Depo. p. 181 at lines 1-14; Young Aff. at ¶11).

Lawson then claims approximately a week after the termination he requested to see the Mayor. (Lawson Depo. p. 187 at line 1 to p. 188 at line 22) According to Lawson, it was during the course of this meeting that Mayor Young allegedly said she made a mistake, but again, Lawson clarifies that the Mayor told Lawson she would reconsider the termination pursuant to the grievance procedure if he would take the grievance procedure letter. (Id.)[6] Lawson testifies:

> Q.    Well, if she told you she was going to reconsider it and she made a mistake, why didn't you take the letter?
>
> A.    Because I told her - -
>
> Q.    You didn't do it because that conversation never took place did it, Mr. Lawson?
>
> Object to form
>
> Q.    You would have taken that letter - -
>
> A.    Job first - - I told her job  first - -
>
> Q.    * * * You would have taken that letter if she had told you I made a mistake, I'm reconsidering, here's this grievance form - - you would have taken that letter, wouldn't you?
>
> Object to form
>
> A.    Rephrase that.
>
> Q.    There is nothing to rephrase. If she told you I made a mistake and I'm reconsidering, here's a grievance form for you, you didn't take it?

---

[5]  Mayor Young explains that because Lawson was on probation in the meter reading department, she mistakenly believed he did not have grievance procedure rights. (Young Aff. at ¶ 11). When she realized she was wrong, she contacted Lawson immediately and attempted to deliver the proper information to him about filing a grievance. (Id).

[6]  Mayor Young denies that she has any recollection or any record of ever speaking with Lawson after the meeting on December 9, 2005 when he would not take the grievance procedure letter. (Young Aff. at ¶12).

> That's all I want to know.  That's your sworn testimony: you didn't take it?
>
> A.    I did not take that letter.

(Lawson Depo. p. 188 at line 23 to p. 189 at line 4).

Lawson described this last meeting with the Mayor in a somewhat confusing matter but ultimately clarified that the Mayor said she would reconsider the termination if Lawson pursued the grievance procedure but that she was not going to simply give him his job back.  (Lawson Depo. p. 191 at line 5 to p. 192 at line 2, p. 193 at line 4 to p. 194 at line 20).

### 2.    Information Gathered After Termination

Lawson also claims that the City tried to "cover their tracks" by gathering information after the fact.  (Lawson Depo. p. 195 at line 19 to p. 196 at line 10, p. 197 at lines 7-17).  He bases this information on hearsay that the City was gathering information after he left.  Lawson refers to Jason Locke, the City's Revenue Officer.  (Lawson Depo. p. 195 at lines 19-21).  Jason Locke was requested to pull all information from Lawson's meter reading cycles after the City found out Lawson was estimating meter readings so that any bills that had been issued incorrectly could be rectified.  (Young Aff. at ¶16; Locke Aff. at ¶3).  Bill collections or adjustments were part of Locke's job.  (Locke Aff. at ¶2).  In fact, to that end, Locke clarifies that when he began working on the issue, it was easily demonstrated that Lawson had been estimating meters because of the extreme inconsistencies and the number of wrong readings.  (Locke Aff. at ¶3).

### 3.    Contact with Co-workers

Lawson said he saw Christy Williams at the Diary Cream in Alex City and that he walked up to her and asked her if she was still getting people fired.  (Lawson Depo. p. 221 at lines 6-20).  When questioned about why he would say that when he claims to not have known that she told he was estimating meters, Lawson claims that he did not know but just said that to tease her.  (Lawson Depo. p. 222 at lines 15-19, p. 224 at lines 3-6).  After that conversation, Lawson learned

that Williams had a warrant for harassment issued against Lawson.  (Lawson Depo. p. 224 at lines 3-21, p. 165 at lines 19-21;Exhibit "G" Copy of Williams' Police Report Regarding Lawson). Lawson also spoke with Dax Thomas, a black male and former co-worker, after his termination.  (Lawson Depo. p. 207 at lines 1-23).  Thomas also filed a police report for harassment against Lawson. (Exhibit "H" Thomas' Police Report).

### E.    Lawson's Allegations of Race Discrimination

#### 1.    The Termination

Lawson claims his termination was based on his race because (1) he was the only black meter reader and "they" were prejudiced, (2) the City found out he had prior felony convictions, and (3) white employees were not terminated.

#### a.    Only Black Meter Reader and Prior Felony Conviction

Lawson says the reason he thinks he was terminated because of racial discrimination was because he was the only black meter reader in the department, and because Peppers "kind of act prejudice to me anyway."  (Lawson Depo. p. 174 at line 20 to p. 175 at line 4).  It is undisputed that he was not the only black meter reader because Dax Thomas is also a black male.

In further support of his rationale as to why his termination was race discrimination, Lawson says:

A.    they didn't want me reading meters anyway after they found out the
       simple fact that I had prior conviction anyway.

(Lawson Depo. p. 175 at lines 8-10).[7]

Lawson was again asked why he thought he was fired and he stated: "Because I was a black employee, and they found out I had prior convictions, and they didn't want me reading

---

[7]    It is critical to note that Lawson provides this testimony which conflicts with his earlier deposition testimony that everyone knew about his criminal convictions before he was hired.  Lawson also says that he did not know of anyone else who had been fired for estimating meters and therefore he believed his termination was race discrimination.  (Lawson Depo. p. 176 at lines 14-20).

meters, they didn't want anybody black down there." (Lawson Depo. p. 199 at line 18 to p. 200 at line 1). When asked if he would have been terminated if he was black but did not have prior convictions, Lawson said "I don't know." (Lawson Depo. p. 200 at lines 6-10).

Lawson's testimony about the knowledge of his criminal record simply does not make sense based on the fact that he continually went back to the notion that they terminated him wrongfully when they found out he had prior criminal convictions. (See e.g. Lawson Depo. p. 199 at lines 21-22). Lawson said he did not know whether a meter reader could have criminal convictions. (Lawson Depo. p. 201 at lines 6-14). Lawson confirmed that he did not know another meter reader that had a criminal record. (Lawson Depo. p. 201 at lines 15-21). When asked if there was any other employee the City had ever agreed to hire that had a criminal record similar to Lawson's, he said he did not know of any. (Lawson Depo. p. 123 at lines 2-8).

Lawson testified as follows:

Q.    If you were estimating meters instead of reading them and telling people you were reading them when you weren't, wouldn't that be grounds to fire you?

Object form

A.    I don't know.

Q.    Why don't you know?

A.    I had never seen anything in a rule book say that you'll be fired from that even if you was doing, but I was not estimating meters. ...

Q.    If somebody was estimating and telling everybody he was reading them when they wasn't, they were estimating, wouldn't that be grounds to terminate somebody?

Object to form

A.    I don't know.

(Lawson Depo. p. 209 at line 14 to p. 210 at line 12).

15

When Lawson was asked why the City would have fired him because they did not want black meter readers when he was hired to do just that, he said he did not know.  (Lawson Depo. p. 213 at lines 7-11).

**b.      Alleged Comparators - The Fall Meeting With The Mayor**

Lawson further claims that his race discrimination claim is based on the fact that two white employees, Danny Voss and Mike Blanks, had problems with their meter readings and were not fired.  (Lawson Depo. p. 237 at line 5 to p. 238 at line 8).  More specifically, Lawson explained that prior to the date of his termination, the Mayor came down to discuss the problem of incorrect meter readings.  (Lawson Depo. p. 166 at line 17 to p. 167 at line 3).  Peppers clarifies that this meeting occurred during Lawson's training with Walker.  (Peppers Aff. at ¶9).  Lawson said there were never any other meetings about the meter readings until the day of his termination.  (Lawson Depo. p. 166 at line 17 to p. 168 at line 5).

When the Mayor had her meeting with the meter readers in the Fall, she said she wanted things to tighten up because there was a large number of complaints about incorrect readings. (Lawson Depo. p. 168 at lines 8-18).  Lawson said the meter readers who had an issue were "two white guys," not him.  (Id.)  Critically, Lawson admits that the complaint at the time was that the meters were being read incorrectly, not that the meters were not being read.  (Lawson Depo. p. 168 at lines 19-23).

Peppers confirms that there was a meeting with the Mayor because of several mistakes found.  (Peppers Aff. at ¶10).  He clarifies however, there were several new employees and Mayor Young felt like it would be a good idea to talk to them about the mistakes and being more careful. (Id.)  Peppers states no one ever informed him and that there was no knowledge that meter readers were intentionally not reading meters and simply estimating meters before he learned that Lawson was doing so; that is, no such report lead to that meeting with the Mayor.  (Id.)  Peppers

16

explains that meter readers can make a mistake and that the meeting was held because there were too many mistakes. (Id.) Peppers also explained that the Mayor brought several examples of wrong readings to the meeting and that Lawson did not have any but that such was the case because Lawson was still training under Chad Walker and would not have had any meter readings recorded under his name at that time. (Id.) Mayor Young explained that although she had some complaints about incorrect readings, when looking into the matter, they found no consistent patterns of extreme discrepancies or any other indications that any meter readers were simply estimating meters. (Young Aff. at ¶15). Peppers describes in detail the evidence found to confirm that Lawson was estimating meters, before Lawson's termination. (Peppers Aff. at ¶ 6).

Mayor Young has terminated another employee, a white male, for estimating meters, just as she terminated Lawson. (Young Aff. at ¶ 14).

As comparative evidence, critically, Lawson testified as follows:

Q.    Who else do you know that estimated meters?

A.    I don't know about anybody estimating - - for wrong meter reading. That's what I did - - read them wrong - - but I didn't estimate any meters.

Q.    My question is: Do you know of anybody at the City - - any other meter reader - - that estimated meters?

Object to form

A.    I don't know of any meter reader been accused of estimating meters.

Q.    Well, do you know of any that actually estimated rather than reading them?

A.    No sir, I don't.

(Lawson Depo. p. 176 at line 21 to p. 177 at line 14).

Lawson is certain that the City has no evidence that he was estimating meters and he bases this on the following explanation:

> A.     Because the printout, it don't show that you are estimating meters by
> a printout.  You can't base an employ[ee] performance on a printout
> sheet.

(Lawson Depo. p. 243 at line 15 to p. 244 at line 1).

### c.  Young and Peppers

Lawson does not know why he thinks Mayor Young would racially discriminate against him.

(Lawson Depo. p. 265 at lines 12-22).  He has never had any problems or disagreements with her.

(Lawson Depo. p. 265 at line 23 to p. 266 at line 5).  When asked then why he claims racial

discrimination against her, he stated:

> A.     I claim she racially discriminated with me because no other
> employee, the white employee had misconduct in the department
> and neither one was reprimanded, nobody was fired - - I was the
> only one brought to the Mayor's office.  By being a black employee
> I felt like she racially discriminated with me, she didn't want to sit
> down and talk about what the matter was, it was just like I was fired.

(Lawson Depo. p. 266 at lines 8-16).  Lawson then claimed at the end of his deposition that Mayor

Young said "as much as she had did for us people."  (Lawson Depo. p. 267 at lines 1-10).  He then

clarified that he said "as much as she did for you people, your mother and your father and your

uncle, Terry, used to stay with us when he was a little boy, and I can't believe you are bringing up

these kind of allegations against us."  (Lawson Depo. p. 267 at lines 20 to p. 268 at line 1).  Lawson

then admitted that he did not know whether she was referring to him as a black person when she

said "you people."  (Lawson Depo. p. 268 at lines 2-11).

Mayor Young testified that that she "would have never terminated Mr. Lawson based on his

race."  (Young Aff. at ¶17)**.**  She explains that she "hired him and was responsible for finding him

a transfer position when he risked losing his job because of his own failed efforts toward obtaining

a state required certification."  (Young Aff. at ¶ 17).

Lawson further said that he thinks Peppers discriminated against him because of accusing

him of doing something he did not do.  (Lawson Depo. p. 269 at lines 3-6).  However, Lawson has

18

never had any problems with Peppers.  (Lawson Depo. p. 201 at line 22 to p. 202 at line 3).

Lawson had no complaints regarding Peppers as a supervisor.  (Lawson Depo. p. 202 at lines 4-6).

Lawson clarified that Peppers never said anything to him that was racially discriminatory nor did

Peppers ever act in a racially discriminatory manner towards him.  (Lawson Depo. p. 202 at lines

7-15).

### 2.    Disparate Treatment At Water Plant

Lawson claims to have had one complaint regarding how Eugene Mahan treated him as

opposed to the white employees while working in the water plant but says he talked to the Mayor

about it and the issue got better.  (Lawson Depo. p. 140 at line 1 to p. 141 at line 22).  This alleged

complaint and conversation with the Mayor occurred while Lawson was still on probation at the

water plant. (Id.) The complaint was allegedly based on the notion that Lawson was assigned jobs

that the other employees did not have to do.   (Lawson Depo. p. 238 at line 9 to p. 240 at line 8).

Again, Lawson confirmed that after speaking with Mayor Young, the matter was resolved.  (Id.)

Mahan clarifies that Lawson was not the only black employee in the department and that Lawson

was never assigned tasks that were not asked of every employee.  (Mahan Aff. at ¶¶5, 6).  Mahan

also states that Lawson never made complaints to him.  (Id.)  In fact, this claim seems out of place

with Lawson's testimony about how close he became to Mahan, which Mahan confirms.  (Id.)

### 3.    Grade 4 Certification Requirement

Lawson claims that it was unfair that he be given a specific time in which to obtain his

Grade 4 certification because nobody else had been given such a limitation.  (Lawson Depo. p. 121

at line 1 to p. 123 at line 1).  However, it should be noted that he makes this claim about everybody,

regardless of race.[8]  Moreover, Mayor Young explains that all employees getting that job with the

City must obtain the certification within fifteen months because ADEM requires it to be obtained

---

[8] In fact, he names employees that he says did not have the restriction and one of the individuals he
names, Jacky Wycoff, is black.  (Lawson Depo. p. 123 at lines 19-21).

within a reasonable time after employment.  (Young Aff. at ¶5).  Every employee had the same restriction as Lawson.  (Id.)  In fact, Lawson does not claim that this alleged difference was based on his race.  (Lawson Depo. p. 125 at lines 17-22).  Regardless, Lawson was transferred at his request before the 15 month period ended.[9]

### III.
### Argument and Conclusions of Law

### A.    Standards Governing Summary Judgment

"The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Gonzales v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986)); Fed.R.Civ.P. Rule 56(c).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  The moving party's burden may be met either by demonstrating that there is no evidence of a dispute of material fact or by demonstrating that the non-moving party has failed to make a showing "sufficient to establish the existence of an element essential to that party's case, and on which [she] will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; see also *Real Estate Financing v. Resolution Trust Corp.*, 950 F.2d 1540, 1543 (11th Cir. 1992) ("One way to seek an award of summary judgment is for the moving party to demonstrate that an essential element of the non-movant's case is lacking.").

_____

[9]   Lawson's Complaint makes a claim regarding wages being incorrect because of his race but clarifies that he is basing his claim on the fact that when he was hired he was given a stipulation of time in which he had to obtain his Grade 4 certification.  (Lawson Depo. p. 240 at line 9 to p. 241 at line 2).

After the moving party has met its burden under Rule 56(e), the non-moving party must go beyond the pleadings and designate specific facts from affidavits, answers to interrogatories and/or depositions showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U.S. 574,586,106 S.Ct. 1348, 1356, 89 L.Ed.2d. 538 (1986).

The Eleventh Circuit Court of Appeals has held that where the movant meets the initial burden of showing either that there are no genuine issues of material fact or the absence of evidence to support the non-moving party's case, the burden then shifts to the non-movant to show the existence of a genuine issue of material fact. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). The court in *Fitzpatrick* held for issues on which the non-movant would bear the burden of proof at trial as follows:

> For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. *Celotex*, 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting). Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. (citation omitted).

*Fitzpatrick*, 2 F.3d at 1116.

**B.    Argument**

**1.    Qualified Immunity**

From the outset it should be noted that there is no individual liability pursuant to Title VII for race discrimination, therefore, any Title VII claims brought against Danny Peppers and Mayor Barbara Young are due to be dismissed as a matter of law.  See *Busby v. City of Orlando*, 931 F.2d 764 (11th Cir. 1991).  To that end, these individuals as government employees are entitled to qualified immunity which offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional law which a reasonable person would have known about.  *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir. 2002).  Qualified immunity is "a pure legal decision of (1) whether the implicated federal constitutional right was clearly established and (2) whether the alleged acts violated [the] law." *Koch v. Rugg,* 221 F.3d 1283, 1294 (11th Cir. 2000).  Defendants Young and Peppers maintain that Lawson has failed to plead sufficient facts indicating that any of their actions were a violation of clearly established constitutional law such that a reasonable person would have known about.  That is, the determination of whether a federal law is clearly established must be made in light of the specific context of each case, not a broad, general proposition.  *Vinyard,* 311 F.3d at 1349. However, for the purposes of summary judgment only, Young and Peppers acknowledge that it has been established that race discrimination in public employment is prohibited.  See *Gardner v. City of Camilla, Georgia,* 186 Fed.Appx. 860 (11th Cir. 2006); see also *Busby* supra.  Specifically, there have been cases regarding race-based employment decisions of discipline, promotions, etc., by a government official.  See e.g., *Alexander v. Fulton County, Georgia,* 207 F.3d  1303 (11th Cir. 2000); *Yeldell v. Cooper Green Hospital, Inc.,* 956 F.2d 1056 (11th Cir. 1992).  Here, Lawson claims he was terminated because of his race.  In *Brown v. City of Ft. Lauderdale,* 923 F.2d 1474, 1478

(11th Cir. 1991), the Eleventh Circuit recognized the right through the equal protection clause to be free from termination because of race.

Accordingly, the issue of qualified immunity in this case revolves around whether the Defendants' alleged acts violated the law. That is, did race discrimination occur? To that end, based on the reasons that are addressed herein, Peppers and Young assert that summary judgment is due to be granted in their favor allowing qualified immunity protections, because there is not a genuine issue of material fact that any conduct they engaged in constituted race discrimination.

### 2.    Race Discrimination Pursuant to §1981, §1983 and Title VII

Title VII of the Civil Rights Act of 1964, as amended, prohibits an employer from discriminating "against any individual with respect to his compensation, terms, condition, or privileges of employment, because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2000(a)(1)(as amended). In the present case, Lawson asserts that he was treated differently and terminated because of his race. In order to support his Title VII claims, Lawson must establish that these actions were the result of intentional discrimination. <u>See</u> *Merriweather v. Alabama Dept. of Public Safety,* 17 F.Supp.2d 1260, 1267 (M.D. Ala. 1998)(citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). He may prove intentional race discrimination through either direct or circumstantial evidence. <u>See</u> *Shuford v. Alabama State Bd. of Educ.*, 978 F.Supp. 1008, 1015 (M.D. Ala. 1997).

 "[E]vidence is direct when it is sufficient to prove discrimination without inference or presumption. Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence." Id. (quoting *Clark v. Coates & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir. 1993)). Lawson offers no direct evidence of intentional discrimination. Therefore,

23

Lawson must prove his claim by circumstantial evidence through a framework of shifting burdens of proof.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court created a framework of the burden of production and order of presentation of proof to analyze circumstantial evidence of discrimination.  See *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184, reh'g denied, 747 F.2d 710 (11th Cir. 1984) (noting that the *McDonnell Douglas* framework is a valuable tool for analyzing disparate treatment cases).  To prove discriminatory treatment through circumstantial evidence, the plaintiff must first make out a *prima facie* case.  If a *prima facie* case is not established, summary judgment is due to be granted. If a *prima facie* case is established, the burden shifts to the defendant to produce legitimate, nondiscriminatory reasons for the alleged adverse employment action.  When legitimate, nondiscriminatory reasons are proffered, the burden then shifts back to the plaintiff to establish that those reasons are pretextual.  *McDonnell Douglas*, supra, 411 U.S. at 802-04.  If the plaintiff fails to produce evidence sufficient to permit a reasonable factfinder to disbelieve the defendant's proffered nondiscriminatory reasons, summary judgment should be granted. *Holifield v. Reno*, 115 F.3d 1555, 1565-66 (11th Cir. 1997).  For the reasons discussed herein below, Lawson's race claims pursuant to Title VII are due to be dismissed as a matter of law.  To that end, because summary judgment is appropriate on Plaintiff's Title VII claims, summary judgment should also be granted as to Plaintiff's §1981 and §1983 claims because those claims are analyzed under the same standards as Title VII.  See *Stallworth v. Shuler,* 777 F.2d 1431, 1433 (11th Cir. 1985) (holding that the *McDonald Douglas* framework for proving intentional discrimination is applicable to §1981 claims); *Rolle v. Worth County School Dist.*, 128 Fed.Appx. 731, 732 n.4 (11th Cir. 2005)(citing *Standard v. A.B.E.L. Servs*, *Ins*., 161 F.3d 1318, 1330 (11th Cir. 1998); *Cross v. Alabama,* 49 F.3d 1490, 1508 (11th Cir. 1995)(holding that if §1983 is brought in a cause of action

24

as a parallel remedy for a violation of Title VII, the elements of the causes of action are the same).[10]

### 3.    Termination

Lawson cannot present a genuine issue of material fact regarding his termination claim.

### a.    *No Prima Facie* Case

Lawson's termination claim fails because he cannot establish a *prima facie* case of race discrimination in regards to why the City terminated him.   To make a *prima facie* case of termination, Lawson must establish, by a preponderance of the evidence, "(1) that he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the job; and (4) the Defendants treated similarly-situated employees outside his protected class more favorable.[11]"  *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1091(11th Cir. 2004); see also *Holifield,*115 F.3d at 1562.  Lawson cannot establish a *prima facie* case because there was no adverse employment action and he was not treated differently than similarly-situated employees when he was terminated.

### (1)    No Adverse Employment Action

Even though he was terminated, Lawson cannot establish that he suffered an adverse employment action because it is undisputed that he refused to take the grievance procedure letter that could have ultimately resulted in the Mayor reconsidering the termination.   Lawson

---

[10]  Defendant Alex City asserts that, in addition to meeting the Title VII standards, Lawson would have to further prove that the alleged deprivation was taken pursuant to a practice, policy or custom *Martinez v. City of Opa-Locka, Fla.*, 971 F.2d 708, 713 (11ᵗʰ Cir.1992) (citing *Monell*, 436 U.S. at 690-91). Lawson has not pled such here and cannot establish facts of same even if it were possible to create a question of fact as to the Title VII analysis.

[11]  Lawson could meet this element by presenting evidence that he was replaced by an individual outside his protected class but that is not how he approaches his case.  Rather, he argues that he was treated differently than similarly situated white employees.  See *Keel v. U. S. Dept. Of Air Force*, 256 F.Supp.2d 1269 (M.D.Ala. 2003)(where court looked to whether similarly situated employees were treated more favorably to determine a *prima facie* case because Plaintiff had not argued the method of *replaced by someone outside the protected class*).

unequivocally admits that Mayor Young said she was mistaken when she did not offer the grievance process to him and that Mayor Young said that, through that process, she would reconsider the termination. (Lawson Depo. p. 187 at line 1 to p. 188 at line 22). He refused to take the letter. (Lawson Depo. p. 188 at line 23 to p. 189 at line 4). Lawson's position is that he did not estimate the meters. He further claims the City cannot prove otherwise. Assuming the facts in the light most favorable to Lawson, he would have received his job back through the grievance process. He certainly cannot establish here that he would not have received his job. As such, Lawson's failure to exhaust his administrative remedies in an attempt to retain his job negates his ability to establish an adverse employment action. Defendants did not find a case directly on point but assert that this case presents special facts: Lawson did not suffer an ultimate adverse employment action because he did not allow the City to reconsider his termination as Mayor Young reassured him would happen. (Young Aff. at ¶11). Courts considering this concept in collective bargaining cases and the like have accepted this notion. <u>See</u> ie *Fusaro v. Haileah Housing Authority*, 33 F.Supp.2d 1354 (S.D. Fla. 1999).

Accordingly, Lawson did not suffer an adverse employment action when he was terminated. Any adverse employment action would not have been effective until he did not prevail through the grievance procedure. Therefore, Lawson cannot establish a *prima facie* case and summary judgment is due to be granted in Defendants' favor.

### (2) No Proper Comparator was treated better

Even if Lawson had suffered an adverse employment action, he still cannot present a *prima facie* case of race disparate treatment because he cannot present proper evidence that similarly-situated employees were treated differently than him. The Eleventh Circuit has clarified that in order for comparators to be similarly-situated, they must be "nearly identical." <u>See</u> *Maniccia v. Brown,* 171 F.3d 1364, 1368-69 (11th Cir. 1999) (holding that alleged misconduct must be nearly

identical for comparators to be considered similarly-situated).  Moreover, the burden is on Lawson

to present affirmative evidence that he is similarly-situated to the alleged comparators.  See e.g.

Keel, 256 F.Supp.2d at 1285.  The Eleventh Circuit has plainly stated that the burden is on the

plaintiffs "to show a similarity between [his] conduct and that of white employees who are allegedly

treated differently and not on [the defendant] to disprove their similarity."  See Jones v. Gerwens,

874 F.2d 1534, 1541 (11th Cir. 1989).   The comparators must be similarly situated in all aspects

or their conduct must be of comparable seriousness for that which he was discharged in order for

this burden to be met.  Holifield, 115 F.3d at1563.  The Eleventh Circuit requires "that the quantity

and quality of comparator's misconduct be nearly identical to prevent courts from second-guessing

employers' reasonable decisions and confusing apples and oranges."  Keel, 256 F.Supp.2d at 1286

(citing Maniccia, 171 F.3d at 1368).  The Keel court further states:

> In making this analysis a Court must keep in mind that 'Title VII does
> not take away an employer's right to interpret its rules as it chooses
> and to make determinations as it sees fit under those rules[.]"

Keel, 256 F.Supp.2d at 1286 (citing Maniccia, 171 F.3d at 1369).

In the present case, Lawson cannot establish similarly-situated individuals that were treated

differently.   It is undisputed that a white individual has been terminated by Mayor Young for

estimating meters, just as Lawson was terminated.  (Young Aff. at ¶14; Peppers Aff. at ¶12).  More

importantly, the two individuals to whom Lawson attempts to compare himself were simply people

who had made mistakes on their meter readings. (Young Aff. at ¶15; Peppers Aff. at ¶9).  Even

Lawson clarified that he is unaware of any time wherein other individuals were accused of

estimating meters as opposed to actually reading them.  (Lawson Depo. p. 176 at line 21 to p. 177

at line 14).  Rather, he admits that the only time a related issue came up was during the fall

meeting with Mayor Young, which undisputably was over misreadings – not estimating – of meters.

(Lawson Depo. p. 168 at lines 1-13; Peppers Aff. at ¶ 10).  To that end, it cannot be reasonably

argued that a new meter reader making a mistake is the same seriousness as Lawson intentionally not reading meters. The information that Peppers found before recommending the termination of Lawson was extensive. (Peppers Aff. at ¶ 6). In an attempt to correct customer bills, Locke confirmed this information. (Locke Aff. at ¶ 3). That Lawson is arguing that his decision to not read meters should be seen as equal to the problem of new meter readers making mistakes when reading meters is irrelevant to this analysis. See *Barrow v. Georgia Pacific Corp.,* 144 Fed.Appx. 54, 58 (11th Cir. 2005)(holding that plaintiff's claim failed when he presented only his own unsubstantiated opinion that he was qualified for a position in question). In short, there is no dispute that (1) the individuals who made mistakes in meter reading had not committed the same wrong as Lawson and (2) that the white employee who had also estimated meters received the same treatment as Lawson. As such, Plaintiff cannot establish a *prima facie* case of race discrimination in regard to his termination because there is simply no evidence that he was treated differently than similarly-situated individuals. Accordingly, summary judgment is due to be granted in favor of the Defendants.

### b.    Legitimate Non-discriminatory Reason

Even if Lawson could establish a *prima facie* case of discrimination, he cannot present evidence of pretext regarding the legitimate, non-discriminatory reason for terminating him. Because Defendants need only produce, not prove, the nondiscriminatory reasons, the burden is "exceedingly light". See *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983); see also *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).

Defendants have plainly stated that Lawson was terminated because he was estimating meter readings which caused incorrect bills to be issued to the utilities customers of Alex City. Because Defendants have met their burden of production, Lawson must come forward with evidence:

> sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination. (citations omitted). This evidence must reveal "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'"

*Vessels v. Atlanta Indep. School System,* 408 F.3d 763, 771 (11th Cir. 2005) (citing *Cooper v. Southern Co.,* 390 F.3d at 695, 725 (11th Cir. 2004). Moreover, each of the race-neutral reasons must be sufficiently rebutted. *Chapman v. A.I. Transport,* 229 F.3d 1012,1037, n.30 (11th Cir. 2004) (citing *Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir. 1997).

Lawson cannot provided information that the reason given for his termination is mere pretext. First, other than his own testimony, Lawson can present no evidence that he in fact was not estimating meters. In fact, the overwhelming evidence is to the contrary. (Peppers Aff. at ¶ 6; Locke Aff. at ¶ 3). More critically, Lawson cannot provide any evidence that the decision-maker, Mayor Young, did not in good faith believe that he, in fact, was intentionally estimating meters at the time that she made her decision to terminate him. The *Keel* court is instructive on this issue:

> Evidence showing a false factual predicate underlying the employer's proffered reason does not unequivocally prove that the employer did not rely on the reason in making the employment decision. Instead, it may merely indicate that the employer, acting in good faith, made the disputed employment decision on the basis of erroneous information. It is obviously not a violation of federal employment discrimination laws for an employer to err in assessing the performance of an employee. Thus, establishing pretext is not merely demonstrating that the employer made a mistake, but that the employer did not give an honest account of its behavior.

*Keel,* 256 F.Supp.2d at 1287. The *Keel* court clarifies that such a rule is long-standing in the Eleventh Circuit citing numerous Eleventh Circuit cases holding such. Thus, it matters not that Lawson maintains that he did not estimate meters.

It is also important to note that it is irrelevant that Lawson might disagree with how the evidence against him was gathered, how the issues were communicated to him, or how the

wrongful conduct was compared to other individuals that had made mistakes. That is, Lawson's position that he was not on notice that you could be fired for it or that you cannot judge his performance on an printout is certainly no evidence of pretext. Again, Lawson would have to provide evidence that Defendants did not believe he estimated meters when making the subject employment decision against him. See *Moore v. Sears,* 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) (noting "it is well settled in employment discrimination cases ... that for an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance," (citing *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (other citations omitted)). Such is certainly not the case here.

Lawson's testimony that he was the only black employee in the department also fails to establish evidence of pretext. Lawson says he believes that he was terminated because he is black based on the premise that nobody else was reprimanded or terminated that day. However, this statement is certainly not evidence of pretext in that he goes on to admit that he has no knowledge of any other individuals being accused of estimating meters. Accordingly, any other employee's treatment that day is irrelevant. Moreover, Lawson was not the only black employee in the department as is testified to by him and confirmed by Mahan. (Mahan Aff. at ¶6). As such, no race claim is possible as to his termination. See *Perryman v. West*, 949 F.Supp. 815 (M.D. Ala. 1996)(plaintiff's claim of race discrimination failed when he insisted that he was singled out from all other employees, white and black individuals).

To the extent that Lawson would present evidence of pretext based on his allegation that individuals similarly-situated were treated more favorably, the Defendants adopt and incorporate herein the discussion regarding similarly-situated individuals previously addressed. To that end, it is undisputed that there was no individual similarly-situated to Lawson, as that term has been defined by Eleventh Circuit case authority. Peppers described in detail the difference in Lawson's

wrongful conduct and the mistakes that some new meter readers had made that caused the Mayor to have a meeting with them in the Fall of 2005.  (Peppers Aff. at ¶9).  Locke confirmed the difference between making a mistake and the evidence he saw regarding Lawson's estimating meters.  (Locke Aff. at ¶3).  Further, a white meter reader has been fired for estimating, just like Lawson.  Precedential case authority dictates that a significant difference would be recognized between mistakes by new employees and intentional conduct by another.  See e.g. *Silvera v. Orange County School Bd.,* 244 F.3d 1253, 1259 (11th Cir. 2001); *McCaskill v. ConAgra Foods, Inc.*, 296 F.Supp.2d 1311, 1317 (M.D. Ala. 2003); *Davis v. Qualico Misc. Inc.*, 161 F.Supp.2d 1314 (M.D. Ala. 2001).

Lawson's unsubstantiated opinion that Peppers "acted kind of prejudice" is certainly no evidence of pretext especially in light of his further testimony where he in detail denied that Peppers ever spoke to him in a racially derogatory manner, said anything racially derogatory, or acted in a derogatory manner.  (Lawson Depo. p. 201 at line 22 to p. 202 at line 15).  The same is also true for Mayor Young.  To the extent that her conduct toward Lawson is attempted evidence of pretext, such is meritless.  It is undisputed that Mayor Young never said or did anything to Lawson that was racially discriminatory.  (Lawson Depo. p. 265 at line 23 to p. 266 at line 5).  Her mistake about the grievance procedure has no bearing whatsoever on the decision to terminate Lawson.  It is undisputed that she corrected her mistake the next day.  Lawson's refusal to take the letter and pursue the grievance procedure certainly cannot serve as evidence of pretext.  If anything, Lawson's failure to pursue a grievance indicates he knew his conduct to be wrong.

Lawson's unsubstantiated testimony that the City simply did not want black people reading meters is also meritless and certainly not evidence of pretext.  The notion that the City simply did not want a black person reading meters is somewhat absurd in light of the fact that it is undisputed that Peppers, Mahan, and Mayor Young all helped get Lawson the job as a meter reader.  (Peppers

31

Aff. at ¶3; Young Aff. at ¶¶8,9; Mahan Aff. at ¶8).  Lawson claims Mayor Young wanted to give him another chance.  Lawson provides no reasonable explanation as to why these same people, without reason, had a change of heart and wanted him fired just because of his race.

Additionally, there is no causal connection between Lawson's race and his termination. Lawson ultimately carries the burden of at least linking, in some way, his race to the unfavorable treatment.  He claims that he feels like he was fired because of his race, which is simply not sufficient evidence of discrimination.  It is insufficient to claim that the other employee was white. See Geer v. Marco Warehousing, 179 F.Supp.2d 1332, 1341 (M.D. Ala. 2001) (holding that "employers decision to upgrade technology in one area should not be interpreted as sexual discrimination [under Title VII] merely because the employee in the other area happens to be a member of protected class.").  Without a causal connection, Lawson again, fails to establish a prima facie case of discrimination.

Based on the foregoing, Lawson fails to present evidence of pretext and therefore the legitimate, nondiscriminatory reason for his termination remains unrebutted.  As such, summary judgment is due to be granted in favor of Defendants and Lawson's claims dismissed as a matter of law.

### 4.    Other Disparate Treatment

Lawson also makes mention of two other potential issues of race discrimination: (1) unfavorable treatment by Mahan while he worked at the Water Filtering Plant; and (2) unfavorable treatment when he was made to obtain his Grade 4 certification within fifteen months of his hire date.

First, Lawson is unable to establish that the issues upon which he attempts to base his claims constituted an adverse employment action.  Inconveniences and job assignments do not constitute an adverse employment action.  See Belt v. Ala. Historical Com'n, 2005 WL 1653728

32

(S.D. Ala.).  Moreover, being required to obtain the certification to maintain his job would not in and of itself constitute an adverse employment action, because not everything that happens negative to an employee is an adverse employment action.  See *Davis v. Town of Lake Park, Fla,* 245 F.3d 1232, 1238 (11th Cir. 2001).   As such, Lawson cannot establish a *prima facie* case of disparate treatment regarding either of these issues because there is no evidence that he suffered a materially adverse action.

    In the alternative and assuming for the sake of argument that either of those issues could constitute an adverse employment action, Lawson cannot establish a *prima facie* case of race discrimination in regard to these issues because it is undisputed that he was not treated differently than similarly-situated employees.

    As to his treatment in the Water Filtering Plant, Lawson provides only his speculation that he alone was made to do jobs that were more difficult or undesirable than his co-workers. However, Mr. Mahan clarified that Lawson's job assignments were no different than what is expected of everybody in the department.  (Mahan Aff. at ¶5).  More importantly, Lawson was not the only black employee in the Water Filtering Department.  Therefore, his testimony that he was doing what no one else was doing, (Lawson Depo. p. 239 at line 20 to p. 240 at line 5), is certainly unrelated to his race and as such, this claim must fail.  Additionally, as it relates to any claim that Mahan treated Lawson differently, it should be noted that in Lawson's deposition he was not confident about any type of claims against Mahan.  He maintained that he and Mahan were close and they talked about a lot of things.  (Lawson Depo. p. 115 at lines 1-13).  Lawson further said that he talked to the Mayor about a problem with Mahan and that it was rectified at that time.[12]  Said evidence further establishes that he did not suffer an actual adverse employment action because Mahan allegedly treated him differently.

---

[12] The mayor says this complaint was not about unfair treatment based on race.  (Young Aff. at ¶7).

In regards to the Grade 4 certification issue, Mayor Young clarifies that regardless of what Lawson might have thought about this requirement, it is undisputed that ADEM dictates that all employees in the Water Filtering Plant obtain a Grade 4 certification within a reasonable amount of time after being employed in the department.  (Young Aff. at ¶5).  Therefore, the City has a rule that any employee getting a job in that department must get a Grade 4 certification within fifteen months.  This rule applies to everybody who gets a job in that department.  Lawson was given the same restriction.  Lawson did not have any rules or stipulations placed on him when he was awarded that position that differed from any other individual that was awarded that position.  Again, Lawson was not the only black employee in that department and so Lawson's contention that he was the only person who had to obtain that certification in and of itself establishes that any differences that he perceived that existed were not based on his race.  He admits same.  (Lawson Depo. p. 121 at line 1 to p. 122 at line 1).  As with the allegations about his treatment at the water treatment plant, claiming that he was singled out from everyone else negates his ability to establish a race claim.  See *Perryman*, supra.

Because the two issues that Lawson raises outside of his termination are not sufficient to establish an adverse employment action and because there is not sufficient evidence to establish he was treated differently than similarly-situated individuals, summary judgment is due to be granted as to those claims.

Even if there was some type of *prima facie* case established as to these issues, there is no question that there is simply no evidence of pretext regarding Lawson's treatment while employed with the City.  Lawson cannot establish that he was treated less favorably than similarly-situated white employees because of his race.  Where Lawson fails to show the existence of similarly-situated employees, summary judgment is appropriate where no other evidence of discrimination

is present. *Holifield,* 115 F.3d at 1562 (<u>citing</u> *Mac v. Great Atl. and Pac. Tea Company,* 871 F.2d 179, 182 (1st Cir. 1989).

### C.    After-Acquired Evidence

Defendants assert that they did not know that Lawson had a prior felony conviction before he was hired full-time with the City.  Mayor Young testified that Lawson would not have been hired had she known about the felony conviction.  (Young Aff. at ¶13).  The Lee Staffing Application clearly states that Lawson does not have a felony conviction.  (See Application).  Although Lawson initially testified that everybody knew about his past, he clearly testifies later that one of the reasons that the City wanted to fire him was because they found out about his felony conviction.  As such, Defendants maintain that pursuant to pertinent case authority, Lawson cannot recover against Defendants because he would have otherwise been terminated when the City found out about his felony convictions and would not have ever been hired.  At the least, Lawson's recovery against the City, even if there ever was a jury verdict, would not include reinstatement or front pay.  <u>See</u> *Prescott v. Independent Life and Accident Ins. Co.,* 878 F.Supp. 1545 (M.D. Ala. 1995).

### *IV.*
### *Conclusion*

Based on the undisputed facts of this case and precedential case authority, summary judgment is due to be granted on all Lawson's claims against Defendants.  Under the undisputed facts, there is no genuine issue of material fact to be submitted to a jury.

**Wherefore premises considered**, Defendants request this Court to grant summary judgment in its favor and dismiss Lawson's claim against them as a matter of law.

Respectfully submitted this the 30th day of July 2007.

/S/ Elizabeth Brannen Carter
Randall Morgan [8350-R70R]
Elizabeth Brannen Carter [3272-C-38-E]
HILL, HILL, CARTER, FRANCO,
    COLE & BLACK, P.C.
425 South Perry Street
Montgomery, Alabama 36101-0116
(334) 834-7600
(334) 263-5969 facsimile
Rmorgan@hillhillcarter.com
Counsel for Defendant

OF COUNSEL:

HILL, HILL, CARTER, FRANCO
    COLE & BLACK, P.C.
Post Office Box 116
Montgomery, Alabama  36101-0116
(334) 834-7600
(334) 263-5969

### CERTIFICATE OF SERVICE

I Hereby Certify that I have this date served a true and correct copy of the foregoing *Memorandum Brief in Support of Motion for Summary Judgment on Behalf of Defendants* with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, using the CM/ECF system which will send notification of such filing to: Ethan R. Dettling, Esquire (eDettling@wcqp.com) and Jon Craig Goldfarb, Esq. (Jgoldfarb@wcqp.com), this the 30th day of July 2007.

*/S/* Elizabeth Brannen Carter
Of Counsel

36